United Boiler Heating & Foundry Company, Appellee, v. Ackermann-Quigley Printing Company, Appellant.

Gen. No. 29,408.

1. NEGOTIABLE INSTRUMENTS—*check as assignment pro tanto of funds on deposit.* Where a check was given after banking hours of one day and payment stopped before the opening of the bank on the next day and it was never certified or accepted it did not at any time become the same as money transferred, or an assignment *pro tanto* of the funds of the drawer on deposit with the bank.

2. NEGOTIABLE INSTRUMENTS—*propriety of exclusion of evidence of failure of consideration for check.* In an action upon a check upon which payment had been stopped where defendant's affidavit of merits alleged total failure of consideration and set up certain alleged facts tending to prove the truth of that allegation and defendant's counsel offered to prove such facts, the court erred in refusing to permit defendant to make such proof.

3. NEGOTIABLE INSTRUMENTS—*right to impeach compromise settlement for which check was given.* Where plaintiff agreed to make and install automatic stokers for defendant to be paid for when completely installed and operating and, controversy having arisen, a settlement agreement was made and a check given in part payment, plaintiff guaranteeing the stokers for two years against defects arising by reason of defective material and workmanship, and the stokers broke down and defendant ordered payment stopped on the check, claiming that at the time the settlement agreement was made defendant had no knowledge of any defect in the machinery that would cause it to collapse, defendant was entitled, in a suit upon the check, to prove that plaintiff had failed to perform its promises under the settlement agreement.

4. NEGOTIABLE INSTRUMENTS—*breach of warranty of fitness of machinery to be manufactured and installed as defense to check.* In an action upon a check given at the time a settlement agreement was made on a contract for the installation by plaintiff for defendant of automatic stokers, defendant has the right to show that when payment of the check was stopped the stokers had broken down and wholly failed to work because of defective material and workmanship, contrary to an express warranty in the settlement agreement, that plaintiff refused to furnish and replace the broken or defective parts as the agreement required and that

112    APPELLATE COURTS OF ILLINOIS.

U. B. H. & F. Co. v. Ackermann-Quigley P. Co., 236 Ill. App. 111.

defendant, on account of such refusal, was obliged to rebuild the stokers at a cost equal to or greater than the amount of the check.

5. NEGOTIABLE INSTRUMENTS—*admissibility of sales contract to show breach of warranty in action on check given on settlement agreement.* Where a settlement agreement was made under a contract for the installation of automatic stokers and a check given by defendant pursuant to such agreement, the original contract was admissible, in an action upon the check, payment of which was stopped because of a breakdown of the stokers, for the purpose of showing how and of what materials the stokers were to be constructed and whether the failure of the stokers after the settlement agreement was made was caused by defective material or workmanship.

6. CONTRACTS—*compromise settlement as barring evidence of previous transactions by merger.* In an action on a check given pursuant to an agreement made in settlement of a contract for the installation of automatic stokers, all that was said and done prior to such settlement regarding previous trouble with the stokers or evidence of defects which had appeared and been repaired before such settlement was merged in the written agreement of settlement and was incompetent.

7. SALES—*admissibility of evidence of representations of seller as to operation of machinery to be manufactured.* In an action upon a check given pursuant to an agreement made in settlement of a contract for the installation of automatic stokers, alleged promises or representations made by plaintiff as to what the stokers would do or how well or how long they would operate are incompetent because not purporting to be representations of existing facts.

8. NEGOTIABLE INSTRUMENTS—*incompetency of evidence as to original contract in action on substituted settlement agreement.* Where the guaranties contained in an original contract for the installation of automatic stokers were superseded by those contained in a settlement agreement, evidence offered in an action on a check given pursuant to the settlement agreement regarding the alleged failure of the stokers to comply with the guaranties contained in the original contract was incompetent, the defense to the check being failure of consideration by nonperformance of the settlement agreement.

9. SET-OFF, COUNTERCLAIM AND RECOUPMENT—*when evidence in recoupment and set-off admissible in action for price.* In an action upon a check given in accordance with an agreement made to settle a controversy over a contract for the installation of automatic stokers for defendant where the amended affidavit of merits contained enough to show that defendant claims not only a total

failure of consideration but also a set-off or counterclaim for loss and damages occasioned by breach by plaintiff of a warranty for two years' operation contained in the settlement agreement, evidence of recoupment and set-off is competent.

Appeal by defendant from the Municipal Court of Chicago; the Hon. JOHN J. ROONEY, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1924. Reversed and remanded. Opinion filed February 3, 1925. Rehearing denied February 26, 1925.

BARTEL, KIRK & McCORMICK and WILLIAM A. ROGAN, for appellant; HOWARD H. McCORMICK, of counsel.

KNAPP & CAMPBELL, for appellee; JOHN R. COCHRAN, LEONARD F. MARTIN and PAUL R. CONAGHAN, of counsel.

MR. PRESIDING JUSTICE FITCH delivered the opinion of the court.

This is an appeal from a judgment in favor of the plaintiff for the sum of $3,585.99, which represents the amount, with interest, of a check signed by the defendant, payable to the order of E. C. Ackermann and by him indorsed to the order of the plaintiff.

The amended statement of claim alleges that the check was executed, indorsed and delivered on the day of its date, and was given in pursuance of the terms of a "settlement agreement," entered into on the same day, which is set forth in full in the statement of claim. That agreement states, in substance, that in October, 1920, defendant entered into a written contract with Geare & Company, of Chicago, for the installation of two "traveling grate stokers" in defendant's plant at Cicero, Illinois; that said contract was assigned by Geare & Company, with defendant's consent, to the plaintiff, and that plaintiff "has installed said stokers in accordance with said contract" and that the same "are now in operation in the plant" of defendant; that "questions have arisen between

114    APPELLATE COURTS OF ILLINOIS.

U. B. H. & F. Co. v. Ackermann-Quigley P. Co., 236 Ill. App. 111.

the parties hereto in the settlement and payment of the consideration named in said contract'' regarding certain deductions claimed by defendant and disputed by plaintiff, amounting to $1,186.13, and regarding trouble the defendant ''has had with the operation of said stokers in this that a number of the cast grates have broken from time to time and other minor defects from time to time appeared,'' all of which had been repaired and replaced by plaintiff, but that defendant ''is still unsatisfied that said stokers will stand up and do the work required of them; therefore, in order to effect a settlement of the contract price for the installation of said stokers, * * * and to compromise and avoid litigation arising out of the aforesaid contentions of the parties,'' it is agreed that from ''a balance now due'' of $5,461 shall be deducted one-half of the amount claimed by defendant, ''leaving a net balance due under said contract'' of $4,867.94; that ''upon the execution of this contract'' defendant shall pay to the plaintiff the sum of $3,274.88, and ''shall retain in its hands'' $1,593.06 of said balance ''as a guarantee of said stokers so installed against defects of workmanship and material used in the construction thereof''; that one-half of the amount retained shall be paid to the plaintiff at the end of one year, ''if said stokers shall operate properly'' during that time, and the other half shall be paid on a like condition at the end of two years, ''which sum and final payment shall be in full settlement and payment of said contract price,'' it being ''expressly understood, however,'' that the guarantee of the plaintiff therein mentioned ''shall be construed to mean only that'' plaintiff ''guarantees for said period of two years said stokers so installed by it against any defects arising by reason of defective material and defective workmanship in the construction, erection, and installation thereof''; that defendant shall bear the expense of all ordinary repairs

made necessary by the use and operation of said stokers and by reason of the ordinary breakage of grates and other parts thereof, occurring unavoidably in the usual and ordinary course of operation; and plaintiff agrees, during the period mentioned, "to furnish and replace at its expense any part or piece or casting of said stokers which shall break or become inoperative by reason of defective material or defective workmanship in installing the same."

To this statement of claim the defendant filed its affidavit of merits, which sets up *in hæc verba* the original contract with Geare & Company for the installation of said stokers, and the assignment of that contract to the plaintiff, and then states that after the erection of the stokers, tests were made and it was found "that the grates were falling out and the iron bars holding the grates were breaking," and that the stokers were without side plates and necessary glass windows, which defects plaintiff "proceeded to correct," and thereafter other tests were made from time to time, disclosing other defects, which plaintiff asked leave of defendant to correct; that on March 7, 1922 (which is the date of the "settlement agreement" mentioned in the statement of claim), the plaintiff "represented" to the defendant that "its contract had been completed," that "the stokers were operating efficiently," that "no breakage would occur" thereafter, that "there would be no further defects in the construction or operation of the stokers since the repairs and alterations made by the plaintiff had been completed," and that plaintiff would warrant them to "stand up and operate in an efficient manner" for two years, ordinary wear and tear excepted, that plaintiff "intended to see that these machines operated to the satisfaction of the defendant and that if not satisfactory, plaintiff would make them so"; that defendant had no knowledge of stokers or stoker machinery, and relied entirely upon the truth of such

"representations"; that, thereupon, plaintiff's president, who was then on board a train bound for New York, gave an order on E. C. Ackermann to indorse to the order of the plaintiff the check sued on, which was already signed and made payable to said Ackermann; that said Ackermann indorsed the check as an accommodation to the plaintiff, without any consideration for such indorsement; that said check was delivered to the plaintiff at four o'clock in the afternoon of March 7, 1922, and that at three o'clock in the morning of March 8, 1922, "the said stokers broke down and would not run or operate, nor would they do the work for which they were intended, and for which they were constructed," but were then "destroyed, broken and became one mixed lot of parts"; that plaintiff was notified of that fact and payment on the check was stopped; that upon an examination of the stokers, after the breakdown, it was found that they were not properly installed, "were not square and true to measurement," but were "installed at an angle," resulting in the breaking of the grate bars, and that in many other respects (enumerated in the affidavit) the stokers were found defective in materials and in workmanship; that plaintiff was immediately requested "to rebuild the stokers and make them work," which it refused to do, whereupon defendant proceeded to rebuild them; that it completely rebuilt one at a cost of $3,700, and that the other was in process of erection, but not completed, at the time the affidavit was made, that the cost of rebuilding the second stoker was estimated to be about the same as the first. Wherefore, it is said, the plaintiff is not a holder of the check in good faith for value, that the consideration therefor has wholly failed, that the cost of the completed repairs on one stoker is in excess of the amount of the check sued on, and that the cost of repairing both stokers is in excess of $7,500.

To this affidavit of merits, the plaintiff, by leave

of court, was permitted to file a long reply, which sets up again the "settlement" agreement and again asserts that the consideration for the check was that agreement, and adds what amounts to a replication of the statute of frauds to "the supposed promises, warranties and representations," alleged in the defendant's affidavit of merits.

The suit was begun in April, 1922. The amended statement of claim was filed in December, 1922, and the case was tried in January, 1924. Two days before the trial began, on motion of the defendant, leave was given it to file an additional paragraph to the affidavit of merits (which was filed and which denies any joint liability of the defendant), and at the same time it was ordered that the statement of claim be "stricken from the files" as to said E. C. Ackermann, apparently on the ground that no cause of action was alleged against him in the statement of claim. This order was amended at the time the case was called for trial so as to show a formal dismissal as to said E. C. Ackermann. Then defendant's counsel made an oral motion for leave to file a set-off and a further amended affidavit of merits, which motion was overruled upon the grounds that the motion came too late and was not accompanied by any formal statement of set-off or proposed amendment. A jury was then impaneled, and the trial began. Plaintiff introduced the check, the settlement agreement, a computation of the amount of interest due on the check, and rested. Thereupon, out of the hearing of the jury and apparently for the purpose of showing that the remaining defendant (appellant) could prove the defense set up in the amended affidavit of merits, counsel for the defendant made many offers of proof, some in line with the allegations of the amended affidavit of merits, and others entirely beyond and outside of it. All of such offers were objected to upon the ground that none of them, if proved, would constitute a defense

to the check. The objections were sustained, and the jury were instructed to find in favor of the plaintiff for the amount of the check with interest. The verdict and judgment followed.

The stenographic report of the trial shows that the theory upon which the court acted in directing the verdict was that the "settlement agreement" was binding on both parties, that the offers of proof made on behalf of defendant did not tend to prove any fraud or misrepresentation in obtaining that instrument, and that the check "was the same as money transferred" as soon as it was delivered to the plaintiff. That the agreement of March 7, 1922, was made for the purpose of effecting a settlement of the dispute between the parties as to the amount then due upon the original contract and also to satisfy the defendant that the stokers built by the plaintiff would "stand up and do the work required of them," is expressly stated in the agreement. That no competent evidence of fraud or misrepresentation is contained in any of defendant's offers of proof is also clear, we think. Most of the alleged misrepresentations do not relate to existing facts, and the remainder have reference to disputed matters which are covered by the express terms of the warranties in the settlement agreement. But the trial court was in error in holding that the delivery of the check to the plaintiff had the same legal effect as a "transfer" of so much money. If this means anything, it means that the court held that the delivery of the check to the plaintiff amounted to an assignment, *pro tanto,* of the money of the defendant on deposit with the bank. Such is not now the law in this State. By section 188 of the Negotiable Instruments Act [Cahill's Ill. St. ch. 98, ¶ 210] it is provided that "a check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it ac-

cepts or certifies the check." It is not disputed that the check was given after banking hours of one day and that payment was stopped before the opening of the bank the next day. It has never been accepted or certified, and therefore has never at any time become "the same as money transferred."

By section 184 of the same statute [Cahill's Ill. St. ch. 98, ¶ 206], a check is declared to be "a bill of exchange drawn on a bank, payable on demand," and by the ninth section of the act of March 18, 1874, relating to negotiable instruments (Cahill's Ill. St. ch. 98, ¶ 10) it is provided that in any action upon "a note, bond, bill, or other instrument in writing, for the payment of money" it shall be lawful for the defendant to plead that the consideration has wholly or in part failed. An unpaid check is such a "bill or other instrument in writing for the payment of money." The affidavit of merits in this case alleges that the consideration for the check in question has wholly failed, and sets up certain alleged facts tending to prove the truth of that allegation. Defendant's counsel offered to prove the facts so alleged. It follows, we think, that the court erred in refusing to permit the defendant to prove such facts. While it is proper to direct a verdict in favor of a plaintiff if the defense fails for want of proof (*Marshall v. Grosse Clothing Co.,* 184 Ill. 421), yet such a verdict should not be directed if there is any evidence fairly tending to support the claim of the defendant. (*Balsewicz v. Chicago, B. & Q. R. Co.,* 240 Ill. 238, 244.)

It is contended by plaintiff's counsel that "defendant could not be allowed to prove that plaintiff had failed to perform its future promises under the settlement, since defendant was, itself, in default in not having paid the check." In support of this contention, the case of *Purcell Co. v. Sage,* 200 Ill. 342, is cited as holding that "a party in default cannot recoup or set off damages."

In that case, there was a sale of 1,500 tons of coal to be delivered "when required, in car lots, between September 1st, 1895, and September 1st, 1896," and all payments were to be made on the 10th day of the month following shipment. Shipments were made for several months, but not at the times nor in the quantities ordered by the buyer. On March 10, 1896, the buyer refused to pay for the coal delivered during the preceding month, stating that it would not pay until more coal was delivered. The next day, the sellers gave notice that they had rescinded the contract and would deliver no more coal because of the buyer's refusal to pay for the coal already delivered. The Appellate Court found that, in fact, the sellers had delivered all the coal "needed" by the buyer and were not in default when they rescinded the contract. Upon the facts thus found, the Supreme Court held the sellers were entitled to recover for the coal they had delivered prior to the rescission. The court also held that as the buyer had violated its contract in refusing to pay for such coal, it was not entitled to recoup damages occasioned by the sellers' alleged breach of the contract, citing the cases of *Harber Bros. Co. v. Moffat Cycle Co.*, 151 Ill. 84, and *Hess Co. v. Dawson*, 149 Ill. 138. All of these cases are cited and followed in the still later case of *Chicago Washed Coal Co. v. Whitsett*, 278 Ill. 623.

In all of these cases the same kind of a transaction was either involved or considered, namely, the sale of a quantity of merchandise to be delivered in instalments, where the contract required each instalment to be paid for at or about the time of the delivery thereof, and where deliveries were made, though not at the times nor in the quantities specified in the contract, and the vendee accepted and used the merchandise so delivered, with full knowledge of the vendor's breach, but, because of such breach, had refused to pay for the same, whereupon the vendor had re-

scinded the contract. In all such cases it was held that after such rescission the vendor might recover the value of the merchandise so delivered and accepted and that the vendee could not, as against the vendor's claim for such value, recoup or set off damages for the alleged failure of the seller to deliver such goods at the time and in the quantity provided by the contract.

None of such cases presents a state of facts like the present case. As was said of them by Mr. Presiding Justice Dibell of the Appellate Court of the Second District, in *Black Diamond Fuel Co. v. Illinois Fuel & Phosphate Co.*, 219 Ill. App. 150: "These were cases where a forfeiture had been declared." In each of such cases, the contract had been rescinded or abandoned before suit was brought, and the recovery sustained was not upon the contract, but was upon a *quantum valebant*. Here, the claim of the plaintiff is not based upon any theory that either the original contract or the settlement agreement had been rescinded. It is not "in assumpsit for the value of the castings made and delivered to the defendant," as in *Hess Co. v. Dawson, supra,* but is for the amount agreed to be paid in settlement of a claim of the plaintiff for the contract price of work done and materials furnished under a contract which it claimed was fully executed. Defendant claims that at the time such settlement agreement was made, defendant had no knowledge of any defect in the machinery that would cause it to collapse. If this is true, defendant was not in the same legal position as the vendee in any of the cited cases, who accepted deliveries with full knowledge of the vendor's breach. It is also to be noted that here there was no sale of goods to be delivered and paid for in instalments. The contract was for two machines to be constructed by the vendor and paid for when completely installed and operating, and the settlement agreement was made on that theory, as its recitals show.

Furthermore, the alleged breach of warranty here relied on by defendant is a breach of the plaintiff's warranty that the stokers constructed by the plaintiff would "work properly" for two years and would not break down by reason of defective materials or workmanship. In *Staver Carriage Co. v. American & British Mfg. Co.*, 188 Ill. App. 634, the court said: "We think no Illinois authority can be found holding that the failure to pay for goods that, *after delivery* to the purchaser, have been found to be defective and not suitable for the purpose for which they were purchased or that are in other respects not as they were warranted to be, is a waiver of the right to sue for damages resulting from a breach of the warranty." We agree with that statement.

In *Underwood v. Wolf*, 131 Ill. 425, it is said (p. 435): "Where there is a sale and delivery of personal property *in præsenti* with an express warranty, and the property turns out to be defective, the vendee may receive and use the property and sue for damages on a breach of the warranty, or, when sued for the purchase price, he may recoup such damages under the general issue or set them up in a special plea of set-off. This is a well-settled rule."

That case has been cited, followed and approved in many later cases, and we do not understand that the principle therein announced has been overruled by the *Purcell* case, *supra*, or the other similar cases above cited. We are of the opinion that the facts of the present case bring it within the rule announced in *Underwood v. Wolf, supra,* and not within the rule announced in *Purcell Co. v. Sage, supra.* Section 49 of the present Uniform Sales Act [Cahill's Ill. St. ch. 121a, ¶ 52] confirms this view.

While the settlement agreement required a payment to be made upon the execution thereof, plaintiff accepted a check instead of a cash payment. This check

was a negotiable instrument and when payment was stopped it became the same as an unpaid note in the hands of the plaintiff. If plaintiff's present contention is sound, then a breach of a warranty of quality and suitableness could never be shown by a defendant in a suit upon a note given for part of the purchase price of goods sold under such a warranty. The general rule is that such a breach may be shown in an action on the note. (24 R. C. L. 107.)

In the early case of *Owens v. Sturges,* 67 Ill. 366, the maker of a promissory note pleaded that the consideration for the note was the price of certain machinery sold upon a warranty of quality, that the machinery did not work, and that, therefore, the consideration for the note had failed. The court there said: ''Where a person purchases chattels on a warranty as to soundness or quality and the contract is executed, on the failure of the warranty the purchaser may recoup the damages sustained by reason of the breach from the purchase price of the chattels. Where the contract is unexecuted, or there is a stipulation that the property may be returned if not found to be satisfactory, or if the warranty be accompanied with fraud in the sale, in such cases the vendee may return the property on discovering the breach of warranty, but otherwise he has no such right. He then must retain the property, but may show the warranty and breach in mitigation of damages, and to reduce the recovery. *Doane v. Dunham,* 65 Ill. 512.'' We do not understand that this rule has been changed in this State by any of the later decisions.

As the case must be tried again, it is proper for us to indicate what part of the offered evidence was competent and what was incompetent. To take up *seriatim* all of the many voluminous offers made by counsel for the defendant would unduly extend this opinion and serve no useful purpose. A general statement of our views will doubtless be sufficient.

We think it is clear that the defendant has the right to show, if it can, that when payment of the check was stopped the stokers had broken down and wholly failed to work because of "defective material and workmanship in the construction, erection and installation thereof," as provided in one of the express warranties contained in the settlement agreement. Also, that defendant has the right to show, if it can, that the plaintiff refused to comply with that part of the settlement agreement which requires it "to furnish and replace at its expense" all parts of the stokers that were broken or became inoperative "by reason of defective material or defective workmanship in installing the same," and that the defendant, on account of such refusal, was obliged to and did rebuild the stokers, and that the reasonable and necessary cost of the same was equal to, or greater than, the amount of the check upon which this suit was brought.

We think the original contract is admissible for the purpose of showing how and in what manner and of what materials the stokers were to be constructed and installed, and whether the alleged breakdown and failure to work after the settlement agreement was signed was caused by reason of defective materials or workmanship, or both. All that was said and done prior to that time, however, regarding previous "trouble with the operation of said stokers," or defects which had appeared and had been repaired before that time, was merged in the written agreement of settlement, and is therefore incompetent.

All alleged promises and so-called representations of the plaintiff as to what the stokers "would" do, or how well or how long they "would" operate, are incompetent for the reason that they do not purport to be representations of existing facts.

The guaranties in the original contract were superseded by those in the settlement agreement, and therefore all offered evidence regarding the alleged

failure of the work done to comply with the guaranties contained in the original contract was incompetent. If it be shown that the breakdown of the stokers on March 8, 1922, rendered them utterly useless, it is obviously immaterial whether the original guaranties were or were not complied with before that time.

We are of the opinion that evidence of recoupment or set-off is competent under the plaintiff's statement of claim and the amended affidavit of merits. The statement of claim recites facts which prima facie constitute a good cause of action upon the check therein described against both the drawer and the indorser of the check, who are severally and not jointly liable. The statute (sections 2, 3, ch. 98, ¶¶ 6, 7, Cahill's Ill. St.) permits them to be joined in one suit, and provides for a judgment "against such one or more of the defendants as are found liable." The amended affidavit of merits, while containing such irrelevant and incompetent matter, as above indicated, contains enough to show that defendant claims not only a total failure of consideration, which "in its modern application is the foundation of recoupment" (*Keegan v. Kinnare*, 123 Ill. 280), but also a set-off or counterclaim for loss and damages occasioned by the plaintiff's alleged breach of "warranty for two years' operation." The settlement agreement set forth in the plaintiff's statement of claim contains such a warranty. It is not clear from the language employed in the amended affidavit of merits whether this is the warranty relied on by defendant. If it is, we think the right of defendant to recoup or set off the reasonable necessary cost of rebuilding the stokers is clear, provided, it be first shown that plaintiff refused to rebuild the same. If any other or different warranty is intended, such as a warranty based upon oral statements or alleged representations made at the time the settlement agreement was executed, we think it is equally clear that such warranty was merged in the written agreement.

For the reasons stated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BARNES and GRIDLEY, JJ., concur.